**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| MONARCH SCHOOL OF NEW ENGLAND, INC.,<br><br>Plaintiff,<br><br>v.<br><br>C.S., T.J.S., Y.S., and the ROCHESTER SCHOOL DISTRICT<br><br>Defendants. | ) | Civil Case No. |

**COMPLAINT**
**SEEKING APPEAL OF DECISIONS OF NEW HAMPSHIRE DEPARTMENT OF EDUCTION HEARING OFFICER**
**(pursuant to 20 U.S.C. § 1415(i)(2)(A))**

Plaintiff Monarch School of New England, Inc. ("Monarch") brings this action, pursuant to 20 U.S.C. § 1415(i)(2)(A), to appeal decisions rendered by a New Hampshire Department of Education ("NHDOE") Hearing Officer ("Hearing Officer") in a due process proceeding between C.S. ("Student"), by and through T.J.S. and Y.S. ("Parents"), on the one hand, and the Rochester School District (the "District") and Monarch on the other hand. In support, Monarch states as follows:

INTRODUCTION

1. Monarch is a private school serving special education students from its facilities in Rochester, New Hampshire. On January 12, 2026, Monarch terminated C.S.'s ("Student") placement at its facility due to Parents' unwillingness to abide by Monarch's policies regarding the supply of relevant medical information concerning Student, and Monarch's concomitant concerns regarding Monarch's ability to safely care for Student.

2. Parents, on behalf of Student, thereafter pursued due process proceedings with the NHDOE, pursuant to N.H. Admin. R. Ed. 1123.01, *et seq.*, to challenge Monarch's termination of Student's placement. In a series of written decisions issued in these proceedings, a NHDOE Hearing Officer made determinations that Monarch submits constitute plain legal error.

3. Specifically, the Hearing Officer made the following errant rulings:

a. On April 15, 2026, the Hearing Officer denied Monarch's motion to dismiss and held that Monarch, as a private school, was an appropriate party to a due process proceeding before the Department, despite there being no reference in any state or federal statute or regulations contemplating as much.

b. On May 14, 2026, the Hearing Officer held that the Student's placement at the private school was available after Monarch informed the Hearing Officer that it was unable to take the Student back without the proper medical information from the Student's medical team. Specifically, the Hearing Officer held, "The evidence established that the private school can safely provide services to the student with the information it has."

c. On May 18, 2026, the Hearing Officer denied Monarch's motion to clarify whether the Student's return was conditioned on a meeting between the medical providers and Monarch staff, and Student providing the medical authorization form. These were the conditions that the medical professionals employed by Monarch required to ensure Student's safety.

d. On June 2, 2026, the Hearing Officer ordered Monarch's nursing staff to "implement the [Student's medical] orders . . . the best of their ability" *even if* the

private school feels it does not have sufficient medical to safely care for the Student. And,

e. Also in the June 2 order, the Hearing Officer held that the private school "is available as a placement for the student," despite Monarch having terminated the Student's enrollment.

4. In bringing the instant appeal, Monarch does not seek to overturn the Student's readmission. Rather, Monarch's goal is to clarify its rights and obligations as a private provider of special education services under federal and state law, and to correct the Hearing Officer's errant rulings.

PARTIES

5. Monarch is a New Hampshire 501(c)(3) nonprofit corporation with a primary business address at 105 Eastern Ave., Rochester, New Hampshire 03867.

6. Student is a natural person who resides in the State of New Hampshire. Student's identity and residential address are being withheld to preserve anonymity and confidentiality.

7. Parents are natural persons who reside in the State of New Hampshire. Parents' identities and residential address are being withheld to preserve anonymity and confidentiality.

8. The District is a municipal corporation pursuant to N.H. RSA § 194:2, and has a primary address of 150 Wakefield St., Rochester, New Hampshire 03867.

JURISDICTION AND VENUE

9. This Court possesses jurisdiction over the instant dispute pursuant to 20 U.S.C. § 1415(i)(2)(A).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2), because all Defendants are residents of New Hampshire and the events giving rise to the claims at issue in this matter all occurred within the State of New Hampshire.

STATUTORY AND ADMINISTRATIVE BACKGROUND

11. The IDEA is a law that makes available a free appropriate public education to eligible children with disabilities throughout the nation.

12. The IDEA is implemented through a framework of federal statute (20 U.S.C. § 1400, *et seq.*), federal administrative rules (34 CFR § 300, *et seq.*), State law (in New Hampshire, N.H. RSA § 186-C), and State administrative rules.

13. Pursuant to the IDEA, a state or local educational agency ("LEA") may place students in private schools and facilities "in accordance with an [IEP], at no cost to their parents, . . . as the means of carrying out the requirements of [the IDEA] or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State." 20 U.S.C. § 1412(a)(10)(B)(i).

14. In such instances, the "State educational agency shall determine . . . that children so served have all the rights the children would have if served by [State educational agencies and local educational agencies]." Id. at § 1412(a)(10(B)(ii). Put differently, the State educational agency is charged with ensuring "that a child with a disability who is placed in or referred to a private school or facility . . . is provided special education and related services . . . and has all of the rights of a child with a disability who is served by a public agency." 34 C.F.R. § 300.146.

15. Similarly, under New Hampshire law, it is a school district's responsibility to "establish an approved program or programs for children with disabilities . . . [or to] pay tuition

to such an approved program maintained by another school district or by a private organization." N.H. RSA § 186-C:10.

16. Where disputes arise concerning a student's education, both federal and state statutes and administrative rules contemplate a formal resolution procedure. See 20 U.S.C. § 1415(b)(6); 34 C.F.R. § 300.507; N.H. RSA § 186-C:16-b; N.H. Admin. R. Ed. 1123.01, *et seq*. The procedures contemplate the filing of a due process complaint by either a parent or a public agency. See, e.g. 34 C.F.R. § 300.507(a)(1); N.H. Admin. R. Ed. 1123.03.

17. Neither federal nor state due process procedures contemplate the filing of a due process complaint by a private school.

18. During the pendency of an administrative or judicial proceeding regarding a due process complaint, "unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement." 34 C.F.R. § 300.518. This right is colloquially known as the student's "stay put" right.

19. In the case of a student placed at a private school, their entitlement to "stay put" rights can be rendered unenforceable when the private school placement becomes "unavailable." See, e.g. Wagner v. Board of Educ. of Montgomery County, 335 F.3d 297, 301-02 (4th Cir. 2003) (affirming trial court's determination that private placement was unavailable where relationship between Student's family and private school had "deteriorated" and the private school "could not be counted upon to provide services"); Henry v. School Administrative Unit No. 29, 70 F.Supp. 52, 60 (D.N.H. 1999) (recognizing student's private school placement to be unavailable when the student aged out of the private school). When a private school placement is rendered unavailable for whatever reason, the student's resident district remains responsible for providing the student with an appropriate program.

20. Under New Hampshire law, any person aggrieved by a due process decision may file an appeal to a court of competent jurisdiction pursuant to 20 U.S.C. § 1415(i)(2)(A), within 120 days of receipt of the final decision. N.H. RSA § 186-C:16-b.

FACTUAL BACKGROUND

21. Student resides in Rochester, New Hampshire, within the District, with his Parents. He is 15 years old and is identified as a student with special education needs.

22. Student has several medical issues requiring a significant medical administration regimen at school and close clinical assessment. His primary nutrition is by feeding tube due to swallowing challenges and subsequent silent aspiration.

23. The District has placed Student at Monarch pursuant to an individualized education plan (IEP) since he was 6 years old.

24. Student's placement at Monarch is subject to Student and Parents agreeing to abide by a Student Contract and policies in Monarch's Student/Parent Handbook. The Parents most recently executed a Student Contract in July 2025. The Parents adhered to the Student/Parent Handbook throughout the Students' entire relationship with Monarch, including sharing medical records and contact information of the medical information.

25. Monarch's Student Contract includes the following provisions:

> I/We understand that attendance at Monarch School of New England is a privilege, and that the privilege can be revoked at any time by the Executive Director for good and sufficient reason.
>
> I/We agree that it is essential that MSNE have continued access to the medical records of the Student for the duration of the Student's attendance at MSNE and I/We agree not to unreasonably refuse to provide access to the Student's medical record for the duration of the Student's enrollment with MSNE.

26. Until September 2025, Student was tolerating, accessing, and making progress under his IEP.

27. In summer and early fall 2025, Student's medical condition began rapidly changing. Student experienced significant weight loss, change in the frequency of vomiting, increased fatigue, and a gaunt complexion. Due to this change, Student was no longer able to engage in and sustain normal periods of instruction and therapy services.

28. Ultimately, the Student had two lengthy hospitalizations in late 2025 – the first from October 21, 2025 through November 12, 2025 (15 school days) and the second from December 2, 2025 through December 23, 2025 (16 school days).[1] As a result of these hospitalizations, Student attended only nine of 41 school days from October 21, 2025 through December 23, 2025.[2]

29. After Student's first hospitalization – in October and November 2025 – Student sought to return to school. Prior to Monarch permitting Student to return, Monarch required Student to supply certain medical information. Monarch also required a re-entry meeting to discuss Student's medical status. Both requirements are consistent with Monarch's policies and practices.

30. On November 11, 2025, Student's primary care physician supplied medical information, including Student's feed and medication orders. November 11, 2025 was a school

[1] Student's parents did not notify Monarch of the December hospitalization. Monarch only learned of the hospitalization when the Student's bus driver reported it to Monarch Staff. Monarch thereafter contacted Student's parents to verify.

[2] Monarch kept the District informed to the best of its ability during Student's extended period of absence.

holiday, but the following day Monarch took steps to clarify the orders with Student's parents. Student then returned to school on November 13, 2025.

31. Upon returning to school in November 2025, Monarch staff had significant concerns regarding Student's well-being. For example, Monarch staff noted increased periods of sleep and frequent intolerance of his feeds which often resulted in vomiting. Moreover, Student was unable to tolerate his educational instruction for more than 5 minutes during a planned 30-minute session before becoming exhausted and expressing discomfort.

32. After just nine school days at Monarch, Student returned to the hospital at the beginning of December 2025.

33. On December 26, 2026, during Monarch's holiday break, Student's parents sent an email to Monarch staff that Student was no longer hospitalized, reporting that "[a]fter another lengthy hospital stay, the cause of [Student's] ongoing weight loss remains unclear."

34. Thereafter, Parents sought to re-enter Student at Monarch as school resumed following the holiday break on January 5, 2026. Included with the request was a letter from Boston Children's Hospital ("BCH") – one of Student's providers during his hospitalizations – containing new feed orders and a statement that Student was able to "return to school and baseline activities per parental discretion."

35. Monarch staff corresponded with Parents via email on January 2 and January 3, 2026 to arrange a re-entry meeting and to discuss Student's hospitalizations and learn updated medical information. Monarch offered January 5, 2026 – Monarch's first day open following holiday break – as a meeting date. Parents declined to meet that day but scheduled a meeting for January 6, 2026 with the District invited to attend.

36. On January 6, 2026, Monarch's nursing, education, and therapy providers met with Student's mother. The District did not attend. During the meeting, Monarch staff attempted to obtain required medical information. Student's mother refused to provide all information requested, including Student's current medications and a hospital discharge summary. The mother also declined to execute medical releases that would allow Monarch to communicate with, and obtain information from, Student's current medical providers.

37. Following the refusal of Student's parents to provide medical information and releases, Monarch's nursing staff raised concerns about their ability to safely care for Student in the absence of the requested information.

38. Monarch kept the District informed, via email, about impediments to Student's reentry. During a virtual meeting on January 8, 2026, Monarch detailed concerns regarding Student's safety. Monarch informed the District that its staff would not compromise on health and safety policies that allowed Monarch to appropriately care for Student.

39. In subsequent emails with Monarch, Student's Parent again refused to return the requested medical releases but instead offered to submit to Monarch medical information that was obtained from Student's providers the Parents determined were relevant for the school.

40. By email on January 8, 2026, Monarch's Executive Director, Jeanette Souther, reminded Student's parents that Student's placement at Monarch was conditioned upon the parents' release of medical information allowing phone and fax communications with Student's medical providers. Ms. Souther advised Parents to review the Student Contract and Monarch's Student/Parent Handbook. Ms. Souther stated that, if the parents did not agree with Monarch's requests and policies, they could pursue an alternative placement for Student. The Parents had previously agreed to the Student Contract and Student/Parent Handbook.

41. The Parents responded to Ms. Souther's email by again refusing consent to the requested releases.

42. Between January 9 and January 12, 2026, the Parents corresponded with the New Hampshire Department of Education regarding Monarch's requests for medical information. In that correspondence, Special Education Complaint Coordinator Kaite Gianotti advised Student's parents that private schools, like Monarch, "operate under their own rules and procedures, which can include requirements for health and safety." Ms. Gianotti reiterated that Monarch "has a policy that requires parents to sign a medical release when a student returns after a significant medical event or hospitalization." Per Ms. Gianotti, "[t]hese polices are set by the private school and are generally conditions of enrollment or continued attendance."

43. Ms. Gianotti also informed Student's parents that **"[e]ven when a student attends a private school placement, the public school district remains responsible for providing a Free Appropriate Public Education (FAPE) under the student's IEP**. This includes all services outlined in the IEP, such as medication administration during the school day, transportation, and related supports. The district cannot transfer this responsibility to the private school or make it contingent on additional requirements that are not part of the IEP." (Emphasis added.)

44. On January 12, 2026, given the Parents' continued refusal to supply Student's current medical information and releases, Monarch terminated Student's placement. Monarch notified the District of this action via letter, stating, "Given the student's medical complexity, with parental refusals to provide the required information to ensure [the Student's] safety and well-being while in our care and on our campus." Monarch also requested that the District

inform Student's parents and immediately schedule an IEP meeting to discuss Student's placement.

45. Thereafter, on or about January 29, 2026, Student's parents brought a due process complaint against the District and Monarch.

46. Due to apparent scheduling constraints on behalf of the District and Student's parents, the requested IEP meeting was not held until February 5, 2026. Monarch participated in the meeting but still had scant information concerning Student's medical condition, particularly as the Student had not been on campus for over two months.

47. The Department scheduled a two-day hearing on Student's due process complaint for February 18 and 27, 2026.

48. When the parties appeared for the first hearing day on February 18, 2026, they first took the opportunity to explore settlement. The parties' settlement discussions bore fruit and led to execution of an Agreement. In pertinent part, the Agreement required the following:

> 2. Parents to provide releases to remain in effect while Student is placed at Monarch School of New England subject to the following:
>
> Fax and phone contact with Boston Children's Hospital - Inpatient Complex Care Service to receive Discharge Summary for all hospital stay(s) and speak with providers for clarifications, questions and concerns for all health matters related to orders, medications, and feeds.
>
> Fax and phone contact with Dover Pediatrics (or future PCP office of the student if there is a change) to obtain the student's complete medication list, and speak with providers for clarifications, questions and concerns for all health matters related to orders, medications, and feeds.

49. However, in the weeks following execution of the Agreement, Parents continued their unwillingness to cooperate with Monarch so that it could obtain required medical information. While the parents signed medical releases as contemplated under the Agreement,

one of Student's medical providers – BCH – rejected the version executed by the parents. Yet, when Monarch explained this to Parents, Parents refused to execute a compliant release, citing that they had already satisfied their obligations under the Agreement.

50. Moreover, Monarch's good faith efforts to obtain information from Student's medical providers were met with uncooperative responses or no responses at all. The scant information that Monarch was able to obtain, including from Student's primary care provider at Dover Pediatrics, was outdated or inconsistent.

51. Based on the refusal by Student's parents to execute the release for BCH and the lack of meaningful information received from Student's providers, Monarch did not accept Student's re-entry, and, on March 9, 2026, again requested an IEP team meeting be convened to address Student's placement.

52. On March 10, 2026, Student filed a Request for Administrative Due Process Hearing seeking an expedited hearing and order enforcing Student's "stay put" placement at Monarch, restoring the student's placement at Monarch, and ordering the District to provide compensatory services.

53. On March 10 and March 11, 2026, Monarch had calls with a non-clinical employee at Dover Pediatrics and Dr. Caroline Leahy of BCH, respectively. In both conversations, it was suggested that Monarch's nursing staff should "defer" to Student's parents with respect to Student's feeding tube prescription. However, it would be inappropriate and unethical for Monarch's nursing staff to receive and implement feeding tube orders from parents, particularly when the parents are not medical professionals. See RSA 326-B:29 ("No person may coerce an RN or an LPN into compromising client safety by requiring the nurse to delegate a nursing activity or task when the nurse determines that it is inappropriate to do so."); RSA 326-

B:37 ("The board may discipline a licensee . . . for . . . [d]elegating or accepting the delegation of a nursing function or a prescribed health function when the delegation or acceptance could reasonably be expected to result in unsafe or ineffective client care."); see also Ed. 311.02(h) (requiring that a detailed written statement from a student's licensed prescriber be in the student's health record before prescription medications are given during the school day); Nur. 404.06 (regarding delegation of nursing tasks); see generally American Nurses Association, Code of Ethics, available at https://codeofethics.ana.org/provisions (last accessed March 20, 2026).

54. In the ensuing days, Monarch continued its good faith efforts to convene an IEP meeting, as follows:

- March 10, 2026: Monarch confirmed availability on District's proposed March 13 and March 20 meeting dates;
- March 12, 2026: Monarch emailed District seeking update on scheduling;
- March 13, 2026: Monarch responded to District email proposing meeting on March 23, 24, or 25 by committing to review availability;
- March 16, 2026: Monarch confirmed availability on March 23 and March 25;
- March 17, 2026: District indicated Student's parents require full 10-day notice and proposed March 31 meeting date;
- March 19, 2026: Monarch confirmed availability for team meeting on March 31.

55. By late-March 2026, Monarch continued to lack the medical information required to be able to safely and appropriately care for Student. Monarch's efforts to obtain the required information were repeatedly stymied by Student's parents. Under these circumstances, Monarch continued in its refusal to permit Student's re-entry, as it was unwilling to compromise its commitment to provide outstanding and medically appropriate care to all its students.

56. On March 23, 2026, the Hearing Officer issued a Due Process Decision, denying Student's expedited due process request and Student's motion seeking to enforce "stay put" against Monarch. The Hearing Officer further ordered that the District ". . . continue to take all necessary steps to ensure the student receives FAPE, given that the student's last agreed-upon placement is unavailable, including convening a team meeting and offering services that proved the student with FAPE within 10 days of this order."

57. On March 26, 2026, Student filed yet another due process complaint with the Department.

58. On April 3, 2026, Monarch moved to dismiss Student's due process complaint to the extent it sought relief against Monarch, arguing that because Monarch is a private school, it is not an appropriate party to a due process proceeding under the IDEA or New Hampshire law.

59. In an order dated April 15, 2026, the Hearing Officer denied Monarch's motion to dismiss, finding that "state and federal law do not preclude a private school from being a party in a due process hearing when the public school placed the student at the private school and the parents allege that the private school violated state or federal laws that apply to the private school."

60. The Hearing Officer's denial of Monarch's motion to dismiss constituted reversible legal error, as it directly conflicts with both state and federal law. <u>See</u> Ed 1123.03 (allowing a parent or public agency to file a due process hearing complaint on any matter described in 34 CFR 300.503(a)(1-2), but not affording private schools similar redress); 34 CFR 300.2(b) (binding public subdivisions); 34 CFR 300.2(c) ("*Each public agency in the State is responsible* for ensuring that the rights and protections under Part B of the Act are given to children with disabilities referred to or placed in private schools and facilities by that public

agency; or placed in private schools by their parents under the provisions of § 300.148.") (emphasis added).

61. The Hearing Officer scheduled a merits hearing in Student's due process proceeding for May 6 and 7, 2026.

62. On May 5, 2026, Student filed a "Partially Assented-To Motion to Enforce Stay Put" ("Stay Put Motion") seeking immediate reentry to Monarch pursuant to Student's "stay put" rights.

63. On May 6 and 7, 2026, Monarch appeared and participated in the due process merits hearing. During the hearing, Monarch's Director of Nursing testified that she continued to be without critical medical information concerning Student and his feeding tube orders. As a result, the Director of Nursing testified that, in her medical opinion, it would be unsafe for Monarch to accept Student back on campus. Monarch also presented testimony from its Executive Director confirming that Parents failed to abide by Monarch policies by unreasonably denying Monarch access to Student's medical records. Monarch further presented expert testimony from an experienced school nurse that confirmed Monarch's requests for additional information were reasonable and that Student's safety could be adversely impacted if the requests remained unanswered.

64. On May 13, 2026, Monarch objected to Student's Stay Put Motion, arguing that Student's placement at Monarch was unavailable for numerous reasons, including the fact that Monarch continues to be without sufficient medical information to safely care for Student.

65. Nevertheless, on May 14, 2026, the Hearing Officer issued an order finding the placement at Monarch "available" and granting Student's request to enforce "stay put" placement at Monarch.

66. Specifically, the Hearing Officer held, "While there is still some medical information that private school staff believe is needed regarding the feeding tube issues, that information is not required to safely implement the feed tube orders, the student's IEP, and provide related services to the student." This holding was against the weight of the evidence submitted at the merits hearing and strayed beyond the Hearing Officer's authority as it concluded issues of medical necessity. See M.K. ex rel Mrs. K v. Sergi, 554 F.Supp.2d 175, 199-200 (D. Conn. 2008) (medical decisions are not subject to review under the IDEA); see also Doucette v. Georgetown Public Schools, 936 F.3d 16, 32-33 (1st Cir. 2019) (finding that administrative exhaustion of medical issues in the due process context is not required because it is "educational issues that are the administrative body's area of expertise.")

67. The Hearing Officer also held that Monarch must uphold the stay put rights for Student. This decision unlawfully placed the "stay put" burden on Monarch, as a private school, as opposed to on the District as the responsible LEA. Moreover, the Hearing Officer's decision inherent in the Hearing Officer's decision is the errant conclusion that the Student's placement is tied to a location – namely, Monarch – rather than a course of program. Abundant authority, as cited in Monarch's objection holds otherwise.

68. Finally, the Hearing Officer determination that Student's placement at Monarch was available constituted legal error. Again, this determination resolved medical questions beyond the Hearing Officer's authorityand was against the weight of authority cited in Monarch's objection holding that a student's placement at a private facility is *per se* unavailable when the private facility terminates the student's placement. Wagner v. Board of Educ. of Montgomery County, 335 F.3d 297, 301-02 (4th Cir. 2003); Henry v. School Administrative Unit No. 29, 70 F.Supp. 52, 60 (D.N.H. 1999).

69. Further confounding the Hearing Officer's granting of Student's Stay Put Motion, during the merits hearing, the Hearing Officer made the following oral ruling: "a meeting shall be held with Student's medical providers and Monarch staff to answer Monarch's medical questions; and, prior to returning to Monarch, the District was to facilitate Monarch's receipt of a medical authorization allowing Monarch to have contact with Student's current medical providers at Boston Children's Hospital." Based on this, Monarch understood that the ordered meeting would occur prior to Student returning to Monarch, if such relief was ultimately granted by the Hearing Officer. However, no reference to this was made in the Hearing Officer's order on Student's Stay Put Motion.

70. As a result, on May 15, 2026, Monarch filed a Motion to Clarify, seeking clarification as to whether the Hearing Officer's order for stay put was conditioned on the oral ruling at the hearing, namely the meeting between Parents and schools and the requirement to share medical consent.

71. On May 18, 2026, the Hearing Officer issued an Order on the Motion to Clarify, stating that the order was not conditioned on subsequent meetings or additional information because the Hearing Officer ruled that the information sought by Monarch is not necessary to safely implement the Student's feed tube orders. Yet again, the Hearing Officer embraced and incorporated medical determinations that were beyond the scope of his authority.

72. On June 2, 2026, the Hearing Officer issued his due process decision (the "Due Process Decision") in which he held Monarch had been provided with sufficient information to implement the feeding tube orders, that Monarch is subject to the New Hampshire Department of Education administrative rules, that Monarch violated Ed 1114.06 and 1114.12 when terminating

the Student's placement, and that the parties can utilize the New Hampshire Department of Education's alternative dispute resolution services if these issues continue.[3]

73. The Due Process Decision restates the Hearing Officer's many legal errors throughout the course of the due process proceeding, and features novel legal errors concerning Monarch's compliance with the Department's administrative rules.

74. Most fundamentally, the Due Process Decision constitutes plain legal error to the extent it holds Monarch is an appropriate party to a due process proceeding conducted under the IDEA and New Hampshire law. Simply put, nothing under the IDEA or New Hampshire law contemplates that a private school, like Monarch, is an appropriate party to a due process proceeding.

75. The Hearing Officer's Decision also finds that Monarch violated Ed 1114.06 and 1114.12 by terminating the Student's placement. This finding is belied by the factual record. These sections require that a private provider of education contact the sending school district (1) regarding matters concerning changes in placement of a child with a disability, see Ed 1114.06(a); (2) when the private provider of special education determines that a child with a disability placed at the facility is not making progress toward meeting IEP goals, see Ed 1114.06(g); and (3) to immediately request the convening of an IEP team meeting when the private provider believes it can no longer implement a child's IEP or provide FAPE, see Ed 1114.12(a). The testimony and evidence submitted at the merits hearing demonstrated that Monarch met each and every one of these requirements. As a result, even if the Hearing Officer

[3] Notably, the Hearing Officer's Due Process Decision makes no mention of the avenues Monarch has, as a private school, to assert seek resolution of due process issues. Monarch submits this is because no such avenues exist.

has authority to render decisions regarding a private school (which he does not), his findings with respect to Monarch's violations of administrative rules are reversible error.

76. Monarch also challenges the Due Process Order to the extent it incorporates the Hearing Officer's prior errant rulings concerning the availability of Student's placement.

77. Finally, the Due Process Order again strays beyond the Hearing Officer's authority to the extent it seeks to resolve medical issues *and* to compel Monarch's medical decision-making process in the future. As one extreme example, the Hearing Officer dictates

> If additional medical information is required to provide services in the future, the private school shall work with the student's parents and medical providers to obtain it. If private school staff are unable to obtain information that they believe is necessary from the student's medical providers, they shall implement the orders they have to the best of their ability with the information they have and contact the parents, medical providers, and the public school district regarding the additional information they want to obtain.

In effect, the Hearing Officer's decision supplants the Hearing Officer's medical decision making for that of Monarch's medical professionals. If upheld, the Due Process Decision would compel Monarch to supply Student with medical treatment without information that Monarch's medical professionals have testified is critical to Student's safety and wellbeing. Monarch cannot and will not abide by this unlawful overreach by the Hearing Officer.

78. As of today, Student has been readmitted to Monarch after Student's medical providers were finally authorized to provide the medical information that Monarch had been requesting for several months.

79. By the instant appeal, Monarch does not seek to challenge Student's admission. Rather, Monarch seeks to clarify its rights and obligations as a private school under the IDEA and New Hampshire law, and to address the Hearing Officer's errant legal rulings regarding same.

**<u>COUNT I</u>:**
**APPEAL PURSUANT TO 20 U.S.C. § 1415(i)(2)(A)**

80. Monarch restates and incorporates by reference fully herein each and every preceding paragraph.

81. Pursuant to 20 U.S.C. § 1415(i)(2)(A), Monarch has been aggrieved by the findings and decisions of the Hearing Officer.

82. As described in detail above, the Hearing Officer's errant rulings include the following:

a. On April 15, 2026, the Hearing Officer denied Monarch's motion to dismiss and held that Monarch, as a private school, was an appropriate party to a due process proceeding before the Department, despite there being no reference in any state or federal statute or regulations contemplating as much.

b. On May 14, 2026, the Hearing Officer held that the Student's placement at the private school was available after Monarch informed the Hearing Officer that it was unable to take the Student back without the proper medical information from the Student's medical team. Specifically, the Hearing Officer held, "The evidence established that the private school can safely provide services to the student with the information it has."

c. On May 18, 2026, the Hearing Officer denied Monarch's motion to clarify whether the Student's return was conditioned on a meeting between the medical providers and Monarch staff, and Student providing the medical authorization form. These were the conditions that the medical professionals employed by Monarch required to ensure Student's safety.

d. On June 2, 2026, the Hearing Officer ordered Monarch's nursing staff to "implement the [Student's medical] orders . . . the best of their ability" *even if* the private school feels it does not have sufficient medical to safely care for the Student. And,

e. Also in the June 2 order, the Hearing Officer held that the private school "is available as a placement for the student," despite Monarch having terminated the Student's enrollment.

83. Given these rulings, an actual controversy exists among the parties regarding the Hearing Officers' authority under the IDEA and its implementing rules and regulations and New Hampshire applicable laws and rules.

WHEREFORE, Monarch requests that this Honorable Court issue an Order:

A. Reversing the Hearing Officer's April 15, 2026; May 14, 2026; May 18, 2026; and June 2, 2026 as the product of plain legal error; and,

B. Granting such other and further relief as may be just and proper.

Respectfully submitted,

MONARCH SCHOOL OF NEW ENGLAND, INC.

By their attorneys,

Dated: September 23, 2026

/s/ Owen R. Graham
Owen R. Graham, Esq. Bar #266701
Soule, Leslie, Kidder, Sayward & Loughman, P.L.L.C.
220 Main Street
Salem, NH 03079
Tel: (603) 898-9776

ograham@soulefirm.com